# Pry's Appeal.

8w253
178  252
J178 257

If the assets which come to the hands of administrators, be sufficient for the payment of all the debts of the intestate, the orphans' court will not at any future period grant an order for the sale of the real estate; although the administrators may have committed a *devastavit* by applying the personal assets to the maintenance of the family.

Nor will the orphans' court grant an order for the sale of real estate for the payment of debts of the intestate, which have lost their lien by lapse of time.

APPEAL from the decree of the orphans' court of *Mifflin* county, granting an order to sell the real estate of Patrick Pry, deceased, to his administrator, Patrick M'Kennan.

*Parker* and *Benedict*, for appellants, argued that the orphans' court have no power to order a sale of real estate, where the personal assets were sufficient for the payment of the debts. 4 *Bin.* 104; 2 *Serg. & Rawle* 7; 6 *Bin.* 497.   Their application to the support of the heirs will not alter the case. 8 *Serg. & Rawle* 347. But it is a fatal objection to the decree that the debts are not liens upon the land decreed to be sold. 2 *Watts* 53; 1 *Watts* 14; 4 *Watts* 13.

*J. Fisher*, for the appellee.

The facts of the case are fully stated in the opinion of the Court, which was delivered by

VIII.—W*

[Pry's Appeal.]

KENNEDY, J.—Patrick Pry, the deceased, of Mifflin county in his lifetime, died intestate in the year 1818, leaving a widow and several children, who were all minors. Shortly after his death, letters of administration on his estate were granted in due form to his widow, Mary Pry, and Patrick M'Kennan. In August, 1820, they settled their administration account of the estate, which was approved of and confirmed by the orphans' court of Mifflin county, without any guardians ever having been appointed, as it is said, for the children, who were still minors at that time, and for years afterwards. The administrators, by their account, charged themselves with 369 dollars 97½ cents as being the amount of the personal assets. They took credit for divers small sums of money paid by them in discharge of fees and costs, incurred in their administration of the estate, as also some small debts owing by the same, amounting in the aggregate to 169 dollars 33½ cents. In addition to this, they also took a credit for 156 dollars for boarding, clothing, and schooling the minor children of the intestate, and for 85 dollars 50 cents as a compensation for their services rendered in administering the estate, thus making the credits, in the whole, amount to the sum of 410 dollars 83½ cents, and showing a balance in their favour of 40 dollars 86 cents. There were other debts, as it now appears, owing by the estate then within the knowledge of the administrators, but not mentioned by them in their administration account, amounting in all to 131 dollars 12 cents. For these debts the administrators were afterwards sued, excepting one of them owing to Jehu Woodward; which was sued for in the lifetime of the intestate, and the suit pending therefor at the time of his death, the account being 76 dollars 81 cents, for which judgment was obtained in 1819 against the administrators. Add the amount of these debts last mentioned, say 131 dollars 12 cents, to the amount of those paid, for which credit is taken and allowed in the administration account, say 169 dollars 33½ cents, and it gives or shows the whole amount of the debts owing by the intestate at the time of his death to be 290 dollars 45½ cents; a sum less than the amount of the personal assets, which came to the hands of the administrators, by 79 dollars 52 cents, a balance in all conscience sufficient to have compensated them most liberally for their services. It is therefore perfectly manifest that there was no lack of assets in their hands to have paid all the debts owing by the estate, had they been faithfully and properly appropriated to that end, instead of having been misapplied and wasted by the administrators. I have left out of view the costs, which accrued on the suits against the administrators, in the cases of the debts sued for, as not being chargeable against the estate, but against the administrators personally, seeing they had assets sufficient to have paid their debts, and thereby have prevented the costs from accruing. It is argued, however, that the settlement and confirmation of the administration account is conclusive in favour of the administrators, and that no exception, as

the day of appeal therefrom has gone by, to the manner in which the assets of the estate were applied, can be taken now either directly or collaterally thereto. The administration account may be conclusive on the administrators as to the facts therein stated by themselves, and as to all matters therein within the jurisdiction of the orphans' court, which have been passed on. But the settlement of an administration account by executors or administrators in the orphans' court, does not necessarily involve in it all the questions which may arise or exist as to their having committed a *devastavit* as to creditors of the estate. So long as the act of assembly was in force, prescribing a certain order in which the debts of deceased debtors should be paid by their representatives, it was never made a question in the orphans' court, in the settlement of estates apparently solvent, or not represented by the executors or administrators as insolvent, whether the assets had been applied to the discharge of the debts in the order prescribed or not; the court, upon being satisfied that the debts mentioned existed and were paid, was bound to allow a credit therefor in the account, and accordingly did so; yet if in fact the estate was insolvent, and the executors or administrators having notice of a debt of superior grade, applied all the assets of the estate to the discharge of debts of inferior grade, they committed a *devastavit* in doing so, and rendered themselves liable personally, as also in their estates, to pay the debt of superior grade; notwithstanding they might, in the mean time, have settled their administration account in the orphans' court, and have obtained credit for disbursing the whole amount of the assets, which came to their hands in the manner therein set forth. It was never held, or even said, that I know of, that the confirmation of the account, in such case, by the orphans' court, would protect or shield the executors or administrators from being liable to the creditor for the *devastavit.* And here it appears from the administrator's own showing, taken in connection with the administration account, as approved and confirmed, that a *devastavit* of the assets, to an amount sufficient to have paid all the debts, which are exhibited now as remaining still unpaid, was most clearly and incontestably admitted by them.

The circumstances of the orphans' court having allowed the credit of 156 dollars, which the accountants claimed as advanced for the support and maintenance of the minor children of the intestate, cannot affect the rights of the creditors of the estate in the least; because the orphans' court had no power whatever to allow or to appropriate any portion of the personal assets to such object, to the prejudice of creditors. Such an act, if attempted, would be regarded as an absolute nullity, for want of jurisdiction or authority on the part of the court. The orphans' court, when it is made to appear to them that the personal assets are not sufficient to pay the debts and support the minor children of the intestate, may, upon application of the administrator, decree a sale of the real estate, if

there be any, for that purpose, but still the debts must be first paid, even should it take the whole of both funds to do it; and in no case can the court either direct or sanction the application of the assets to the support or maintenance of the intestate's family, whether consisting of minor children or others, so as to protect the administrators from being made liable to the creditors, in case the assets so applied should be wanting for the payment of the debts or .claims. It was certainly no part of the duty of the administrators, as such, to take charge of the persons of the children and to provide for them; and, therefore, strictly the expenditure by them for that purpose was not properly introduced into their administration account; yet it must be admitted that such things in practice have been done and passed in the orphans' court too often, without objection. And in the present instance it may be added, that, on the face of the administration account itself there was nothing brought to the view of the court, which went to show or could even lead the court to infer that such appropriation as had been made of the assets for the benefit of the minor children was actually a waste of them, either in law or otherwise; because the debts against the estate, so far as they were exhibited, appeared to be all paid; but those remaining unpaid were kept out of sight, so that the court, from the face of the account, were left rather to infer that all the debts known against the estate were paid off. And hence the court might have 'thought that the assets of the estate, appropriated to the use of the children, were the surplus remaining after the payment of all the debts against the estate, and therefore only what they might have entitled themselves to have received by their guardians in a different form of proceeding. But whether the children were entitled to it or not was a question which did not arise in stating and confirming the administration account, and consequently is not to be regarded as having been passed on at all by the orphans' court. And even if it had, the creditors would not have been concluded or bound by it; because the administrators were not obliged and could not be compelled without a refunding bond, with sufficient sureties therein, being first rendered to them, either under or without a decree of the orphans' court, to pay the children or their guardians, if they had any, any portion of the assets, even after all the debts that they had had any notice of were paid; or if they did, it would have been at their own risk; and such payment of the assets to the next of kin, would not have protected them from being held liable to pay debts subsequently appearing against the estate to the full amount thereof. Then for an orphans' court to lend its aid to an administrator by making an order to enable him to sell the real estate of the intestate, in order either to protect himself from the effect of a *devastavit*, or to reimburse himself money that he may have paid on account of his liability arising therefrom, would, to say the least of it, if not directly contrary to the policy, spirit and meaning of all

our statutes and laws in this behalf, be setting a dangerous precedent.

But there is another objection to the decree made for selling the real estate here by the orphans' court, which we consider insuperable, and for which it must be reversed. The objection is this, that the liens of all the debts claimed to exist against the real estate of the intestate, had been terminated long before the petition for the decree was presented. In other words, the real estate in the hands of the heirs of the deceased, had become discharged by the lapse of time, under the act of the 4th of April 1797, from being liable to the payment of the debts for which the sale was decreed. The fourth section of that act, after reciting that inconveniences may arise from the debts of deceased persons remaining a lien on their lands and tenements an indefinite period of time after their decease, enacts, " That no such debts, except they be secured by mortgage, judgment, recognisance or other record, shall remain a lien on said lands and tenements, longer that seven years after the decease of such debtor, unless an action for the recovery thereof be *commenced* and *duly prosecuted* against his or her heirs, executors or administrators, within the said period of seven years; or a copy, or particular written statement of any bond, covenant, debt, or demand, when the same is not payable within the said period of seven years, shall be filed, within the said period, in the office of the prothonotary of the county where the lands lie." Now here the debts not being secured by mortgage, judgment, recognisance or other record, did not come within the exception contained in the section of the act recited, but being payable within seven years after the decease of the debtor, it was requisite, in order to continue their liens upon his real estate, that actions should be commenced for the recovery of them within that period. This it seems was done; and so far as the commencement of the actions and obtaining of judgments therein went, the requisition of the act would seem to have been complied with. But according to the construction which the act has in this respect received by the decisions of this court, with a view to meet the clause which requires that actions shall be *commenced* and *duly prosecuted* within the seven years, this was not sufficient to keep the liens of the debts alive for an indefinite length of time. The plaintiffs in the judgments ought still to have gone further, and had them carried into execution within a reasonable time, say five years after the expiration of the seven mentioned in the act; or otherwise, if they wished to preserve and continue the liens of their claims, they being still unpaid, beyond twelve years from the death of the intestate, they ought to have sued out writs of *scire facias* upon their judgments, in the manner that is prescribed by the acts directing the course of proceeding to be pursued for the purpose of continuing the liens of judgments upon the real estates of debtors obtained against them in their lifetimes. The decisions of this court, in regard to this point,

are referred to and fully explained in Duncan *v.* Clark, 7 *Watts* 224 to 226. Every thing laid down there in relation to the same, is adopted here as being directly applicable, and as showing clearly that the liens of the debts upon the real estate, which has been decreed to be sold for the payment of them, became extinct many years before the decree was asked for. The twelve years which terminated the liens of the debts, ran out in 1830, and the decree was not applied for until January 1838. The decree and proceedings of the orphans' court are, therefore, reversed *in toto.*

Decree reversed.